OLLIE BREWER, RESPONDENT, v. ASH GROVE LIME & PORTLAND CEMENT
COMPANY, A CORPORATION, APPELLANT.*

Springfield Court of Appeals.   Opinion filed February 17, 1930.

*Corpus Juris-Cyc References: Workmen's Compensation Acts, —CJ,
section 54, p. 64, n. 10; section 127, p. 122, n. 40; p. 123, n. 44, 45.

*Frank B. Williams* and *F. B. Holland* for appellant.

*Fred W. Barrett, Paul Barrett* and *O. J. Page* for respondent.

SMITH, J.—This case arises under the Missouri Workmen's Compensation Act and reaches this court on appeal from a judgment of the circuit court of Greene county, affirming the final award of the Workmen's Compensation Commission, awarding plaintiff compensation for the death of her husband, Jake Brewer, at the rate of $11 per week for three hundred weeks. The plaintiff filed her claim for compensation alleging that her husband was electrocuted by a charged lever and machinery which said lever and machinery the deceased was using as the employee of the defendant at the time of his death.

The defendant denies that this is a compensable case and states that the cause of employee's death is unknown and that there is no evidence of violence to the physical structure of the body and no objective symptoms of the cause of the death, and denies that the deceased was killed by charged defective lever and machinery.

There are some things admitted in this record, viz.: the employment of the deceased, the amount of wages received by him, and his sudden death. The controversy arises over the cause of the employee's death and the question of violence to the physical structure of the body, the defendant claiming that there are no objective symptoms of the cause of the death.

·Under section 3, page 492 of the Workmen's Compensation Laws of 1927 we find that "the employer shall be liable . . . to furnish compensation . . . for . . . death of the employee by accident arising out of and in the course of his employment." And the word "death" as a basis for compensation is defined to mean "only death resulting from such violence and resultant effects . . . ."

The death in this case was admitted, and it is evident, and not denied, that the death occurred to Brewer while in the course of his employment. "In the course of" is defined in Smith v. Levis-Zukoski Merc. Co., 14 S. W. (2d) 470, 472, as follows: "The concensus of authority is to the effect that an injury to an employee arises 'in the course of his employment,' when it occurs within the period of his employment, at a place where he might reasonably be, and while he is reasonably fulfilling the duties of his employment, or engaged in the performance of some task incidental thereto." This definition is in keeping with the language used in paragraph C of section 7, Laws 1927, at page 496, which is as follows:

"Without otherwise affecting either the meaning or interpretation of the abridged clause, 'personal injuries arising out of and in the course of such employment,' it is hereby declared not to cover workmen except while engaged in, or about the premises where their duties are being performed, or where their services require their presence as a part of such services."

The question then for determination is, did anything happen to Jake Brewer to cause his death, and if so did it arise "out of" his employment? Or to put it another way, was what happened there the cause of his death, and if so did it arise out of the employment?

The word "accident" is defined in paragraph b, section 7, Laws 1927, at page 495, as follows: "The word 'accident' . . . shall . . . be construed to mean an unexpected or unforeseen event happening suddenly and violently with or without human fault, and producing at the time objective symptoms of injury."

In the argument of the attorney for defendant he states that there must be an affirmative showing of all the necessary elements of a "personal injury by accident" as given by Schneider in his work on the Workmen's Compensation Law, volume 1, page 306, as follows:

"1. Did the event resulting in disability happen suddenly.

"2. Was the event unexpected or unforeseen?

"3. Did it happen violently, that is, was it effected by force, improper or unnatural?

"4. Was that improper or unnatural force applied to the physical structure of the body?

"5. Did it, at the time, produce outward or external and perceptible change in the body or its functions?

And then in an interesting and artful manner undertakes, yet we think unsuccessfully, to show that in this case the above questions cannot be answered in the affirmative, and we quote his reasons which are as follows:

"Can the above questions be answered in the affirmative in the case at bar? We think not, and for the following reasons:

"1. Here we have a case of sudden death. That much is established by competent evidence. But there is no evidence that the death was caused by an 'event' or that the event happened 'suddenly.' True the death was 'sudden,' but who can say from the evidence what 'event' caused the death, or that the 'event' was also 'sudden?.'

"2. The death was unexpected and unforeseen, but how can it be said from the evidence, that the 'event' was unexpected or unforeseen, when the evidence fails to show what the 'event' was?

"3. Where, in the record, is the competent evidence that there was a violent happening which caused the death—a violent happening effected by force, improper or unnatural?"

We think the defendant is in error in trying to distinguish or show the difference between the "event" and the "death," for as we read and construe the statute, guided by the opinions of our own courts, as well as the opinion of other States, we are led to believe that in the determination of the instant case the "event" was the "death." Let us see if we have any authority for this position. In Webster's Revised Unabridged Dictionary we find "event" defined,

"The consequence of anything; the issue; conclusion; that in which an action, operation, or series of operations, terminates." The question was discussed by the St. Louis Court of Appeals in Carr v. March Bros. Const. Co. et al., 21 S. W. (2d) 897, and on page 899, of that case we have this language:

"Appellants, in support of their insistence that there was no accident shown, invoke the provisions of paragraph (b) of section 7 of the Compensation Act, defining the word 'accident,' as used in the act, to mean 'an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury.' Appellants argue that the 'unexpected or unforeseen event,' as used in the statute, means some unusual or unintentional act, or movement, of the claimant, or other person, or thing, such as a slip, a fall, or a blow, or an explosion, or a breaking down, or some unusual performance, of machinery or appliances. This construction is out of accord with both the language of the statute and its manifest purpose. The 'unexpected or unforeseen event,' as used in the statute, includes an unexpected or unforeseen event (result) ensuing from a usual and intentional act or movement of the claimant done in the ordinary course of his employment. This is the meaning of the term, 'accident' as it is ordinarily understood, and there is nothing in the statute to indicate that the term is there used in the restricted and technical sense insisted upon by appellants."

Again, the Kansas City Court of Appeals in the case of Guillod v. K. C. Power & Light Co., 18 S. W. (2d) 97, held that an "event" need not necessarily be a cause, but generally is a result, and that the word is so used in the Compensation Act, and that court followed and cited with approval several Nebraska cases where the Supreme Court of that State had so construed the statute. The reason given for following that court was that that part of our statute had been copied from Nebraska statutes. In keeping with the above construction of the statute we think the "unexpected or unforeseen event as used in the statute includes in this case, the unexpected or unforeseen death, ensuing from an act or movement of the claimant done in the ordinary course of his employment, or from something that happened to him through the machinery or electrical current, which was being used in the ordinary course of his employment.

The above conclusion also answers the question as to where were the "objective symptoms" (the appellant claiming the evidence failed to show any visible or perceptible signs of an injury on the body). If the "event" was the "result," in this instance the "death," which we think is correct, then the "objective sysmpton" was the visible changed condition of the body from one of life and vitality to that of death. We think we are sustained in this conclusion by the opin-

ion in Guilled v. K. C. Power & Light Co., supra, where the Kansas City Court of Appeals in discussing "objective symptons" quoted with approval from a Nebraska case, on page 100, using this language: "We are of opinion that the expression has a wider meaning, and that symptoms of pain, and anguish, such as weakness, pallor, faintness, sickness, nausea, expressions of pain clearly involuntary, or any other symptom indicating a deleterious change in the bodily condition may constitute objective symptoms as required by the statute." The opinion is followed and approved by the Supreme Court of Nebraska in the case of Van Vleet v. Public Service Co. of York, 195 N. W. 467. And since death occurred suddenly from some cause, does it not of itself answer the question that the cause was violent?

Thus far we have reached the conclusion that the evidence shows that an unexpected and unforeseen event happened, suddenly and violently, with or without human fault, to an employee while in the course of his employment, but it leaves one important feature yet to be determined, and that is whether the accident or event arose "out of" the employment, and that forces a consideration of the meaning of the clause "out of his employment." The words "out of" have been defined by our courts sufficiently for us to determine this case, based upon the evidence that we shall hereafter discuss. In the case of Smith v. Levis-Zukoski, supra, at page 472, the court gave the definition as follows:

"Likewise, it is commonly held that an injury may be said to arise 'out of' the employment, when it is reasonably apparent, upon a consideration of all the facts and circumstances, that a causal connection exists between the condition under which the employee's work is required to be done, and the resulting injury. In other words, an injury arises out of the employment if it is a natural and reasonable incident thereof, even though not foreseen or anticipated; but, in all events, it must be the rational consequence of some hazard connected therewith. [Kiser on Workmen's Compensation Acts (40 Cyc.) 64, 65; 1 Schneider on Workmen's Compensation, 262-281.]"

These words are also discussed, with many authorities cited, in the case of Brady v. Oregon Lumber Co., 243 Pac. 96, 45 A. L. R. 812, 817.

It becomes our duty then to determine from the testimony whether there is sufficient competent evidence produced, and whether there are reasonable inferences of fact, to justify the finding made by the commission, for as we understand it, the extent of our review is so limited by the statute. It is our duty to look to the evidence which is most favorable to support the finding of the commission. [Cotter v. Valentine Coal Co., 14 S.W. (2d) 660, 662.]

We find from the evidence that the deceased was working for the appellant: that he was left in charge of and operating an electric

drill a few minutes before he was found dead; that a warning was given to him and other workers to seek shelter while dynamite shots were to be fired; that it was part of his duty to stop the drill when warnings were given; that immediately after the warnings were given and the shots fired it was noticed that the machinery working his drill had not stopped, and upon investigation he was found dead upon the ground at the place where he had been standing to operate the drill. He was lying on his face with his left hand under his body; with no marks of burns perceptible upon his body, but with a discoloration on his face and on part of his body and with some of the fingers on his left hand drawn, and some of the doctors who saw him thought that fingers on both hands were drawn. An autopsy was had a few hours after his death and there was found on his right thigh some superficial contusions probably made from the fall; two somewhat abnormal conditions were found, one was little hemorrhages, black and blue spots, underneath the pericardium, and the other a dilation of the auricle of the right side of the heart, and the doctor who made the autopsy said that he thought that if a large charge of electricity had passed through his heart that it would have caused the dilation of the auricle of his heart, but that the same conditions might have been found in death from other causes; that the conditions of the heart was compatible to the electricity, and that electricity throws the heart into a state of rapid and irregular contractions, which result immediately in anaemia of the brain and restriction of the cardia sense, and that is what caused the death, and that the twitching and irregular violent contraction of the heart would cause the black and blue spots and not necessarily the electricity itself, and that the black and blue spots might be taken as evidence of violence as well as without violence. The doctor said that he made the autopsy to ascertain the cause of death with the electrocution in mind and found that was one of the possible causes of death, but after he had made his thorough examination he was of the opinion that the cause of death was uncertain.

Dr. Wm. L. Turner testified that he was the doctor for the defendant company and that he was called when they first discovered the man and as he drove up to the scene, about thirty minutes after the death, he met the ambulance taking him away, and stopped the ambulance and got in and found the dead man was very much discolored on his face and arms and parts of his body, and that his lips were discolored more than his face; that he was present at the autopsy and that his body was only slightly discolored then, and that in his report to the company he found no evident cause of death from what he saw, but from the circumstances of his employment it would imply that he was electrocuted.

Mrs. Ollie Brewer testified that she was the widow of Jake Brewer; that they had children born of the marriage, but that they were all dead; and that the funeral expenses were $265 and that the defendant had paid $150 on the funeral expenses; that her husband left home about 6:45 o'clock the morning of his death apparently in good health; nothing had ever been the matter with him except colds occasionally and a little injury he received in the quarry in January before his death in June; that he had worked regularly from the 4th of March to the date of his death and if he had any disease or ailment she did not know of it; that he was thirty-six years old when he died; that he had been drilling since the 4th of March and had been breaking rock before that date. He was working ten hours a day at twenty-seven and one-half cents per hour.

Harry Hooper testified that he was a driller for the company on the date that Brewer died, June 17, 1927, and that Brewer was his helper and had been working as a helper to him for about three months, and that the drill was what is known as a cyclone drill and was operated by electricity. It was a derrick drill. The derrick was about thirty-five feet high and the bit was attached to a rope with which they could raise the bit up and let it down. This bit was operated by machinery which was run by electricity and had 440 voltage. He testified that he had been shocked by the current at the drill before that time. The motor which operated the drill was stopped by turning a lever or switch handle that threw it out of gear and started by throwing it in gear. On that morning he went down to the shop to sharpen the bit but before going he started the drill by turning the power on by the switch and then manipulated the lever and started the machinery, and after the machinery was going the operator would stand there and hold the rope and the machinery would run until it was stopped. And on this particular morning when he went to sharpen the derrick he left Jake Brewer operating the drill. He knew how to operate the drill. The purpose of holding the rope was to keep the bit turning and cutting, and when he left, Brewer was standing there holding the rope, and when he came back Brewer was lying in front of the drill, his feet being right close to the spot where he had been standing. He had nothing in either hand and his feet were not against anything. He testified that he had been shocked by touching the machinery operating the drill. It was all iron and set on a wooden frame, except the derrick was wood, and at times if a person would touch any part of the drill he would get a shock. It had rained the night before and some that morning and there was mud around, and the board on which Brewer was standing was wet. He had received shocks before when he took hold of the lever to let off or take up slack on the rope. The machinery was stopped by use of the lever and Brewer was standing

a good arms length from the lever, and the lever was part of the drill and would emit shocks at times. The lever was iron with nothing to insulate it to keep from getting a shock. He knew he had been shocked from it because he had felt it. The electricity was connected up with the machinery by a cable which ran on polls from the main wire to the drill with an attachment or a cup which slips in a socket and to detach the drill from the current of electricity the cup is jerked out of the socket, and when he got back to the scene that morning the electricity was still on. The motor was shut off but the main cable was not, and the machinery got its electricity through this cable which ran into the socket. He had run that machine for two years and George Proctor was the superintendent of the plant, and Chas. Hayden was the quarry boss, and he testified that he had told them that it would shock and that it needed fixing somewhere, and they said it was static. It would not shock every time the lever was pulled. The levers were all metal but they were not handled with gloves. The Walker Electric Company tested the machinery after Brewer's death, by putting the cable back in the socket and by turning on the electricity and then by putting a couple of test bulbs on the wheels and levers and sand cable and the bulbs lighted up red, and showed that the electricity was not on at full force but it would come and go. Hooper did not help make the test but was there and saw what it did. The drill was standing east and west about thirty or forty feet above the floor of the quarry, and the drill machinery was set on a frame, something like a wagon frame with iron wheels so it could be moved. The drill was about sixteen or eighteen feet long with five control levers at the east end and three of them connected with rods and clutches which engaged the machinery of the drill, and the other two connected with brakes, and the electric motor located at the west end of the drill frame which would be about sixteen feet west of the place where the control levers were located. There was a switch by the motor at the west and whereby you could turn the motor off or on. And there was a cable that led from the motor up north to a pole where it connected with the electric current, and there was a way of cutting the electricity off at the poles which was seventy-five or one hundred feet away from the drill. And another way to cut it off was to remove the cup that slips into the socket. The west wheels of the drill frame had been taken off when it was set at that spot a day or two before, and the iron axle of the west end of the drill rested on the ground. He and Brewer had set the drill there. There was a board put under both of the north wheels to level it and there was another board laid across these boards so it would lay north and south, and that was the board that the driller stood on, and from that board he could reach over and get hold of the lever controllers. This was an oak

board and it was wet that morning. It was about three hundred or four hundred yards to where he went to sharpen the bit and when he left everything was apparently all right. The last position he saw Brewer in he was operating the drill bit and it was about fifteen minutes after he left him until the whistle blew for the men to take shelter from the blasting, and after the whistle blew he noticed the drill still running, and after the shot he could see the rope on the drill churning up and down, but someone shut it down before he got up to the drill, and when he got there the body was lying on the stomach, with his head to the north and his feet to the south. The board that he had been standing on had been scooted off and he was lying across the board with his stomach on it, and with his head lower than the rest of his body. He did not touch any part of the machinery then and did not examine the motor to ascertain whether or not it had been shorted. Brewer was close to the drill hole when he found him, with his feet nearest the drill hole. Brewer had been with him that morning since eight o'clock and was apparently all right and the accident happened about 8:45 A. M.

It was agreed that the weekly wages of the deceased were $16.50. Ed Ellingsworth testified that his attention was first called to the death right after the whistle blew and that he saw him as he came out of the workhouse and ran down as quickly as he could get there and found him lying across a board dead, and took hold of him and as he did so he was shocked and he turned him loose, and at that time the cable that ran back to the post was still in the socket and stayed there some little bit thereafter until it was taken out of the socket. He said it also shocked him when he went to the side of the drill and stepped on the cable. When he first saw the man he was lying down and the drill was in operation and he stopped the drill by shutting off the motor by use of the lever; that he was the first one to reach the drill after the accident, and as he approached he pulled a hand pulley that disconnected the electricity before he reached the body and the motor stopped running. When he first noticed the accident the rope was broken but the motor was still running and the rope was going up and down and continued to move up and down until he pulled the lever. The body, when he first saw it, was lying with the head lower than the rest of the body, and the stomach was across the board. He did not know whether when he first took hold of the body that he might have touched the wheel or the drill but that when he started to pick him up it shocked him and he turned him loose. The shock just tingled his arms a bit. The second shock he got from a loose cable which was not connected with the machinery. It was a wire cable that had been used to pull the drill. It tingled his feet and legs momentarily.

A. H. Walker, an electrical contractor, with fifteen years' experience in Springfield, testified that he was familiar with electrical wiring and electricity in general and that he examined the drill where Brewer had died, about one o'clock in the afternoon, and said that in testing the machinery he had a flash on his test bulb which he laid to a static condition there, that the lights flashed on and then went out; that such a flash did not necessarily show something wrong; that he found a static condition there just for an instant and then it was gone and they tried every way but could not get it back again; that static electricity is a sort of induced current stored in the air—stored in the person—stored about you, and to a certain extent it would be stored in the iron parts of the machinery—in the combined metals of the machinery—and the wood acting as insulators. The test that he made just produced a flash; just brought them up to one-half the brilliancy and then left. One-half the brilliancy would be about 220 volts; and that he had known 110 volts to kill a man under certain conditions; that under certain conditions in getting 110 volts on an ordinary modern distribution system, you are really getting 220 volts because on the transformer proposition the loads are placed up 110 volts, high rail, and zero at the end rail point, and that there are cases of that kind where men have been killed.

We think the foregoing facts brought out by the testimony, and the circumstances in connection therewith, sufficient to submit the questions of fact to a jury had this been a case for a jury to determine, and since the appellate court is required to consider the case just as if it were a case where the facts had been determined by a jury, without considering the weight of the evidence or credibility of the witnesses, we are forced to the conclusion that there was sufficient competent evidence to submit the question to the commission for determination, and since the commission has passed on such testimony it is not for this court to disturb its finding.

The defendant contends that this case should be reversed because there was no statement of facts by the commission as required by the law. We think the statement of facts is sufficient, for in answer to question ten we find this language: "10. How accident happened: employee electrocuted by accidental contact with part of drill highly charged with electricity." Again under question 28 of the finding of facts under Special Findings, this language is used: "The drill was operated by an electric motor with a feed wire carrying 440 volts, much less than which will cause death. Both prior and subsequent to the accident other employees had been shocked by touching the lever, and even other metal parts of the drill. These facts justify an inference that in the usual course of his employment, the employee was electrocuted by accidental contact with the lever

or other metalic parts of. the drill which was highly charged with electricity. And that the accident arose out of the employment." So we are forced to the conclusion that the finding of facts submitted by the commission was sufficient under the law.

Without attempting to say what our findings would have been had we been placed in the position of the commissioners, we think there was sufficient competent evidence to submit the case to the commission on the five necessary elements of a personal injury, and since the commission's finding is an affirmative answer that the evidence showed: (1) an event happened suddenly, (2) unexpected or unforeseen, (3) violently, (4) applied to the physical structure of the body, (5) producing an outward perceptible change in the body or in the functions of the body of Jake Brewer, arising out of and in the course of his employment, it is not for us to disturb that finding.

The judgment is affirmed.

*Cox, P. J.*, and *Bailey, J.*, concur.