ROBERT H. DOWNEY v. KANSAS CITY GAS COMPANY, Appellant.—92 S. W. (2d) 580.

Division Two, March 21, 1936.

*Charles H. Mayer* and *Charles M. Miller* for appellant.

*Harold E. Neibling, Lon J. Levvis* and *Neibling & Levvis for re-*spondent.

COOLEY, C.—Plaintiff sued to recover damages claimed to have been sustained by him while in the employment of defendant, due to the latter's negligence. He recovered judgment for $1,500 from which defendant appealed to the Kansas City Court of Appeals. That court first rendered a decision reversing the judgment but, on rehearing, by a decision in which only two of the three judges concurred, affirmed it. Upon request of the dissenting judge, who deemed the decision in conflict with certain prior decisions of the other two Courts of Appeals, the court, pursuant to the constitutional mandate, certified the cause to this court. Both the majority and the dissenting opinions on rehearing are reported in Downey v. Kansas City Gas Company, 79 S. W. (2d) 1063. Defendant contends that plaintiff's claim, if the trouble of which he complains grew out of his employment, is governed by the Workmen's Compensation Act and within the exclusive original jurisdiction of the Workmen's Compensation Commission. Plaintiff contends that his ailment was an occupational disease which, at the time in question, 1929, was excepted from the operation of the Compensation Act, and further that the question of whether the parties had accepted and were operating under that act was one of fact for the jury and was decided adversely to defendant.

Defendant, a large corporation, was engaged in selling and distributing gas and in selling and installing gas burning appliances, incinerators and water heaters in Kansas City. Plaintiff began working for defendant about the middle of August, 1929, as a pipe fitter's helper, installing water heaters, gas burning appliances, incinerators and sometimes parts of radiators, in stores and houses, and was so employed when the events occurred out of which this action arose. His evidence tends to show the following:

His work was frequently, perhaps usually, in the basements of houses, both old and new. He was helper to one Thornburg, and worked under the latter's supervision and direction. In the work of installation he was required to and did cut holes in flues or chimneys, using for this purpose a chisel and hammer, frequently a wall bar and sledge. Generally the hole to be cut was back of and near the furnace. There was not much space in which to work and "it was hot and sweaty." Pieces of brick, or tile from the lining of the flue, would fall down inside the flue and in order to leave the flue in good condition so as to provide proper draft it was necessary to remove the debris that had so fallen into it. To do that plaintiff would have to reach through the hole which he had made and down into the flue and in so doing would get soot and the accumulations that had adhered to the flue on his hand and sleeve. Many of the flues were very dirty. They had soot, containing, as shown by subsequent chemical analysis, ten to twelve per cent of caustic substances such as creosote and carbolic acid, and fine ashes and a brownish oil stain around the flue openings, which stain, a "gummy, oily stain" could sometimes be seen where it came out of the flue hole and ran down the flue, sometimes as much as six or eight inches or more. In so cleaning out the flues plaintiff would unavoidably get soot and "stuff" on his hands and arms and often, because he was perspiring freely, would thoughtlessly wipe the sweat off his face with his hand or sleeve and thus get the substance with which hand or sleeve was so covered into his eyes. He said "it is only natural for a person to kind of wipe himself that way (indicating) . . . a fellow would try to wipe the sweat off with his hands and have it on his hands and arms." All of plaintiff's evidence tends to prove that it was in that way and only in that way that he got soot or other deleterious substance in his eyes.

Plaintiff testified that he had had no previous experience in the kind of work he was then doing and did not know that there was anything deleterious in the substances with which he thus came in contact. However, he admitted on cross-examination that he knew it would not be good for his eyes to get soot into them. He said that after he had been working for three or four weeks his eyes began to "smart." At first he attributed it to smoke but soon thereafter noticed that when his arms were damp and some of the substance from the flues got on them they would smart and burn and he concluded that the trouble with his eyes was caused by the soot getting into them, as above described, and not by smoke. It was thus that he discovered the cause of the smarting and pain he had felt in his eyes. He testified that there was no particular date he could remember when he got the "stuff" in his eyes, it was "just right along,"—at another time he said it was a "daily occurrence." He spoke to his boss, Thornburg, about it, asking him if he thought there was "any

danger in this stuff." Thornburg replied, "No, nothing serious," —that he did not think there was anything to it. The smarting in plaintiff's eyes continued. After he had worked about two months, which would be four or five weeks from the time he first noticed the smarting and pain in his eyes, they got quite sore. He then again spoke about it to Thornburg, who still thought "there was nothing to it" but said he would speak to Holmgren, the supervisor, and did so, and reported to plaintiff that Holmgren thought there was "nothing to that,"—and further that Holmgren did not think that wearing goggles would be of any benefit.

About that time plaintiff "tried putting argyrol," which he said he knew to be a good eye wash, in his eyes "at home of an evening," which treatment afforded but slight and temporary relief. It is apparent from his testimony that the condition of his eye,—it is practically only the left eye of which complaint is made,—became progressively worse, the eye becoming red and inflamed and very sensitive to bright light, until in March, 1930, when plaintiff first consulted a physician. During that interval plaintiff, pressed as he says by the necessity of supporting his family, continued at work. Whether or not he continued, thoughtlessly or otherwise, to get soot into his eyes in the manner described is not clear from his testimony. He said "he tried to keep from it" after he "found out that was the trouble," carrying with him a clean rag or handkerchief with which to wipe his face. "I had to go into my pocket to get the handkerchief and sometimes I would use my sleeve." He said he did not use his hand or sleeve purposely, when he knew it caused the smarting to his eyes, but "unconsciously," when absorbed in his work. There is no evidence that soot or any such substance ever got into his eyes in any other way than as we have described.

In March, 1930, plaintiff consulted his family physician, Dr. Tarson. By that time his eyelid was badly inflamed and he had developed acute conjunctivitis. Dr. Tarson referred him to an eye specialist. Thereafter he did not work for seven or eight weeks, being treated by two or three doctors, part of the time at a Veterans' Hospital and part of the time at home, and undergoing an operation on his eyelid. After this he returned to work, wearing a pad over his left eye, and wearing dark glasses to soften the light. He was discharged from the company's service about January, 1931, and brought this suit March 6, 1931.

Testimony of experts was introduced which tended to prove that soot from coal smoke, such as found in a considerable percentage of the flues in which plaintiff cut holes, contained an amount of caustic substances sufficient to make it irritating to a person's eye and the tender inner side or lining of the eyelid, and that repeated injections

of soot into plaintiff's eye in the manner testified to by him could have produced the injurious consequences of which he complains.

Plaintiff virtually admitted that on July 19, 1930, he signed an exhibit, shown to have been on a printed form customarily used in reporting accidents under the Workmen's Compensation Act, in which was reported an accidental injury to his eye by getting "a lot of dust in his eye" on July 14, 1930. He claimed he did not read it before signing and did not know that it was such report. He also signed two releases, acknowledging receipt of certain sums paid by the company as wages for the time he was off work and in payment of doctor bills for his treatments. One was on the final receipt form used under the Workmen's Compensation Act, the other a general release of all claims against defendant. The payments are admitted. The purpose for which they were made is disputed. Plaintiff claimed his signatures to all of said papers were procured by fraudulent misrepresentation on the part of defendant. This issue is not urged on this appeal and the evidence relating thereto need not be set out.

The foregoing sufficiently outlines the facts determinative of the question of whether or not plaintiff's trouble was an occupational disease. Further facts, if necessary, will be stated in connection with our discussion of that question. A more detailed statement of facts is given in Downey v. Kansas City Gas Company, 79 S. W. (2d) 1063, supra.

I. As to whether or not the parties were operating under the Workmen's Compensation law we have this situation. Plaintiff's petition states a common-law action for damages and invokes common-law liability. He does not in his petition plead facts showing that the Workmen's Compensation Commission would have jurisdiction of the case. Instead, "apparently to guard against any claim or charge that he was suing for an accident," as said by the Court of Appeals, 79 S. W. (2d) l. c. 1069, and to show that the Compensation Commission did not have jurisdiction, he pleads, "that the injurious consequences of which he complains herein were not caused by any event that happened suddenly or violently at any particular time; that there was no such single event to which the consequences complained of herein were or are directly traceable; but that said consequences resulted from conditions that were more or less usual in plaintiff's said work, and which caused irritation, poisoning, inflammation, weakening, and disease of plaintiff's eyelids and eyeballs and their various parts, without causing, at first, any apparent violence to the physical structure of plaintiff's body."

In its answer defendant pleaded that if plaintiff was injured as alleged in his petition the injury and his resulting rights were governed by the Workmen's Compensation Act, which had been accepted by both parties and under which both parties were operating at the time,

and that, pursuant to the provisions of that act, plaintiff had received and accepted benefits covering the matters alleged in his petition and had executed a final "report and receipt for compensation" (one of the "releases" above mentioned) in accordance with the act, which "report and receipt," is pleaded in full. It also pleads the other release which we have above referred to as a general release.

Plaintiff filed a reply in which he first denied generally "each and every allegation therein (in the answer) contained." He then pleaded that he had no knowledge of any paper "purporting to be a final report and receipt for compensation" or of any paper "purporting to be a release by plaintiff of the cause of action set forth and damages claimed by plaintiff" in his petition and that if defendant had such papers his signatures thereto had been "fraudulently and wrongfully procured from plaintiff by defendant and its agents by deception and misleading of plaintiff," and proceeded to set forth at length the facts and circumstances relied upon as constituting the alleged deception. Then, in response to defendant's plea relative to the Workmen's Compensation Act the reply states: "For further reply to said answer of defendant, plaintiff denies that the matters complained of in his amended petition herein are or ever have been governed by the Missouri Workmen's Compensation Act; that the damage sustained by plaintiff and complained of in his amended petition herein is the result of an occupational disease; and that the same is expressly excluded from application of said Act."

Under recent decisions of this court (Kemper v. Gluck, 327 Mo. 733, 39 S. W. (2d) 330, and later cases following it), where, as here, a plaintiff in his petition states a common-law action for damages and invokes common-law liability, if the defendant wishes to interpose the contention that the claim asserted is one governed by the Workmen's Compensation Act and within the exclusive original jurisdiction of the Workmen's Compensation Commission he must affirmatively plead and prove facts bringing the case within the provisions of that act. Defendant did so plead. Plaintiff did not, by motion or otherwise, challenge the sufficiency of defendant's answer to present that defense. He does not in his briefs attempt to point out wherein it is insufficient. He contends that, on that issue, the burden of proof rested on defendant and the court could not declare, as matter of law, that the parties had accepted and were operating under the Compensation Act and that, therefore, even though it should be held that plaintiff's trouble was not an occupational disease but rather the result of accident, he still makes a submissible case, since the jury may not have believed the evidence tending to show that the parties were operating under the Compensation Act.

It may be stated here that defendant, at the close of the evidence, asked a peremptory instruction directing a verdict in its favor, which was refused. It also asked one telling the jury that the case was governed by the Workmen's Compensation Act and that the verdict must be for the defendant, which was likewise refused. It then asked and was given an instruction telling the jury in substance and effect that if they found that plaintiff's eye trouble was the result of accident then the case was governed by the Compensation Act and the verdict must be for defendant. It is apparent, therefore, that the recovery was on the theory that plaintiff's trouble is an occupational disease.

But, on this question of proof, facts which are admitted by the pleadings do not have to be proved, and we think it is in effect admitted by the pleadings that at the time in question both parties had accepted and were operating under the Compensation Act. Defendant so pleaded and plaintiff's reply amounts in effect to a confession and avoidance of that plea. It is true it begins with a general denial, but it has been held that the plea of general denial does not raise an issue where it is followed by a special plea of confession and avoidance. [See Cowell v. Employers' Indemnity Corporation, 326 Mo. 1103, 1112, 34 S. W. (2d) 705, 708 (1-2), and cases therein cited.] Plaintiff had forecast in his petition that he was asserting a claim which, under the then existing statute, was excepted from the operation of the Workmen's Compensation Act. When defendant pleaded that both parties had accepted and were operating under that act and that the case was governed by it, plaintiff, in his reply, "denies that the matters complained of . . . are or ever have been governed by the Missouri Workmen's Compensation Act," and proceeds to state what can only be understood as his reason for such denial, viz., that his damages resulted from an occupational disease, which was excluded from the operation of the act. Such, we think, is the logical interpretation of the pleadings. It may not be out of place to add that it appears to us from the record that both parties tried the case below on the theory or apparent assumption that the fact that both parties had accepted and were operating under the Compensation Act was not in dispute.

Both the majority and minority opinions of the Court of Appeals express the view that said fact was in effect admitted by the pleadings. We agree with that conclusion. It follows that if plaintiff's trouble was not an occupational disease he cannot maintain this action.

II. At the time in question the Workmen's Compensation Act excluded from its operation "occupational disease in any form." Assuming for the purpose of the case that the facts which plaintiff's evidence tends to prove are established, it becomes a question of law whether plaintiff's injury resulted from occupational disease or from accident within the intendment of the Compensation Act. If the lat-

ter, the action must fail, because the Workmen's Compensation Commission has original jurisdiction thereof.

The question of what constitutes an occupational disease is discussed at length in a recent decision of this court, Wolf v. Mallinckrodt Chemical Works, 336 Mo. 746, 81 S. W. (2d) 323, which had not yet been promulgated when the Court of Appeals certified the instant case to us. In the Wolf case the plaintiff brought a common-law action for damages, claiming that he had contracted a disease called combined sclerosis, a degenerative process of the spinal cord, as a result of breathing certain poisonous gases, fumes and dust while employed in the defendant's chemical works and that it was an occupational disease. This court held that the defendant's demurrer to the evidence should have been sustained because there was no evidence that the disease which the plaintiff had contracted was peculiar or incident to the work or process carried on. The court said, 336 Mo. 746, l. c. 753, 81 S. W. (2d) l. c. 327, "Such evidence is essential to the proof of an occupational disease not only under the common law, but under compensation statutes, which sanction awards for illness, and also under statutes which, as in Missouri and Illinois, afford a remedy independent of the compensation statute." Then follows a discussion of "occupational disease," with citation and analysis of authorities, particularly from Illinois, which, "like Missouri, excludes occupational disease from the benefits of the Workmen's Compensation Act. But again like Missouri . . . by a separate statute gives a remedy for the damage caused by such diseases." (l. c. 327.) Other authorities cited, the court says, illustrate the "peculiar incident of the disease to the employment." After reviewing a number of decisions the court said (l. c. 328):

"Section 13252, Revised Statutes 1929 (Mo. Stat. Ann., sec. 13252, p. 4803), which is similar to the Illinois statutes, is as follows: 'That every employer of labor in this state engaged in carrying on any work, trade or process which may produce any illness or disease *peculiar* to the work or process carried on, or which subjects the employee to the danger of illness or disease *incident* to such work, trade or process, to which employees are exposed, shall for the protection of all employees engaged in such work, trade or process, adopt and provide approved and effective devices, means or methods for the prevention of such industrial or occupational diseases as are *incident to such work, trade or process*. [R. S. 1919, sec. 6817.]' (Italics ours.)

"It will be observed that our statute limits the rights created to 'any illness or disease peculiar to the work or process carried on, or which subjects the employee to the danger of illness or disease incident to such work,' etc., and that it imposes upon the employer the duty to provide devices 'for the prevention of such industrial or occupational diseases as are incident to such work, trade or process.'

"It should be borne in mind that the term 'occupational disease' has the same meaning under the common law, under statutes separate from the Compensation Law; and under that large number of cases in many jurisdictions arising under compensation statutes where the question is whether the employee suffered a compensable injury or had contracted a noncompensable illness. The case of Lovell v. Williams Bros. (Mo. App.), 50 S. W. (2d) 710, 1. c. 713, was of the latter class. The opinion of the St. Louis Court of Appeals thus defines an 'occupational disease': 'It is obvious that there is nothing in the evidence to sustain a finding that plaintiff suffered from an occupational disease. Such a disease is defined to be a disease contracted in the usual and ordinary course of events, which, from the common experience of humanity, is known to be incidental to a particular employment. It ordinarily results from long-continued work in the particular employment. [Industrial Commission v. Roth, 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463.]'

"The cited case of Industrial Commission v. Roth is of the same class of cases as the Lovell case and is one of the leading authorities in this country on the conditions under which death from disease may be compensable as an injury. The opinion in the Roth case thus limited the term 'occupational disease,' 98 Ohio St. 34, 120 N. E. 172, 174, 6 A. L. R. 1463, 1. c. 1466: 'We are therefore of the opinion that the term "occupational disease" must be restricted to a disease that is not only incident to an occupation, but the natural, usual, and ordinary result thereof; and held not to include one occasioned by accident or misadventure.' "

The court said (1. c. 329), that "the meaning and the restrictions of the phrase 'occupational disease' are substantially the same under our statute and in the common-law sense;" and, after pointing out the insufficiency of the evidence to show that the disease there in question was peculiar or incident to the work or process carried on, the court said (1. c. 330):

". . . with the support of substantial evidence tending to show that combined sclerosis is peculiar and incident to the work or process, it would be an occupational disease for which recovery might be had under the statute. And with substantial evidence that it is 'a disease contracted in the usual and ordinary course of events, which, from the common experience of humanity, is known to be incidental to a particular employment' (Lovell v. Williams Bros., supra), combined sclerosis would be an occupational disease under the common law."

In the Wolf case a doctor testified on behalf of the plaintiff, in answer to a hypothetical question based upon the plaintiff's evidence, that the disease there complained of "could be due to the absorption of zinc." Similarly, in the instant case plaintiff's medical expert testified that the conditions described in the hypothetical question

propounded to him "could cause Mr. Downey's eye" to be in the condition in which he found it. In both cases the plaintiff's evidence showed that the condition complained of could have resulted from other causes, not connected with the occupation in question. In the instant case, as in the Wolf case, there was no evidence that any other person had ever suffered a similar trouble growing out of the work carried on in the defendant's plant or from similar work elsewhere. In this case, as in the Wolf case, there was no evidence tending to show that the plaintiff's trouble is "peculiar and incident to the work or process," or that it is "a disease contracted in the usual and ordinary course of events, which, from the common experience of humanity, is known to be incidental to a particular employment." The Wolf case is authority for holding, in the instant case, that plaintiff's trouble is not an occupational disease.

In this case, not only did plaintiff's evidence fail to show that his injury or "disease" was peculiar and incident to the work carried on or that it was contracted in the usual and ordinary course of events incidental to his employment, but it showed that it was in the nature of an accident. Plaintiff did not get the soot in his eyes as a usual concomitant or result of the work he was doing, as where one breathes dust laden atmosphere in his working place or the like. He got it on his hands in the ordinary course of his work, but it was communicated to his eyes by his own thoughtless act in wiping sweat from his face with his soot covered hand. He knew each time that occurred, because each time he felt the smarting sensation in his eyes. Had it occurred but once, or a few times within a short period, and resulted in injury we think there can be no doubt but that it would properly be denominated an accident within the meaning of the Compensation Act.

Under our Compensation Act, where both parties have accepted it, the employer must furnish compensation for personal injury of the employee "by accident arising out of and in the course of his employment." [Sec. 3301, R. S. 1929, Mo. Stat. Ann., sec. 3301, p. 8232.] "Accident" is defined by Section 3305, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3305, p. 8238), as "an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury. The term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom."

In Guillod v. Kansas City Power & Light Co. (Mo. App.), 18 S. W. (2d) 97, 100, it is said, "It is clear that an event need not necessarily be a cause but may be and generally is a result, and the word is so used in the Missouri Compensation Act." To same effect see also

Brewer v. Ash Grove Lime & Portland Cement Co. (Mo. App.), 25 S. W. (2d) 1086, 1088, et seq., where the terms "accident" and "unexpected or unforeseen event" are discussed and authorities cited.

In Lovell v. Williams Bros. Inc. (Mo. App.), 50 S. W. (2d) 710, the plaintiff was digging a ditch, in the course of which work he had to "gouge" downward, with his hand on top of the spade he was using. After working several days his hand "began getting sore and swollen." There had been no previous indications of pain or injury. The hand got worse and a serious injury developed. The evidence tended to prove that the injury resulted from the continued use of the spade over a period of several days, and it was held to be an injury by accident within the meaning of the Compensation Act. The court said that "happening suddenly does not mean happening instantaneously," and, 50 S. W. (2d) l. c. 713 [2-3].

"We are unable to believe that the Legislature intended the word 'suddenly,' as used in the statute, to have the narrow and restricted meaning given to it by the commission. The cardinal purpose of the Compensation Act is to insure the employee against accidental injury arising out of and in the course of his employment. To this end the act should be liberally construed. To exclude any accidental injury to an employee, arising out of and in the course of his employment, this intention should clearly appear from the language used. A strict construction against the employee should not be resorted to in order to accomplish such exclusion."

In Rhinehart v. F. M. Stamper Co., 227 Mo. App. 653, 55 S. W. (2d) 729, the plaintiff contracted pneumonia as a result of working in a cold refrigerator when, before being sent therein, he had been perspiring freely. He sued for damages based on negligence, claiming that he had suffered an occupational or infectious disease that was excluded from the Workmen's Compensation Act. The court denied that contention, holding that the plaintiff had sustained an injury within the meaning of that term as used in the Compensation Act, and said, 227 Mo. App. l. c. 657, 55 S. W. (2d) l. c. 732:

"It is finally contended that there was not an accident as that word is defined and that there was no unexpected or unforeseen event happening suddenly and violently and producing at the time objective symptoms of an injury. The word accident as used in the statute is given the character of an event which is not limited to any single incident or circumstance. The word event is more comprehensive in meaning and in this connection is synonymous with the word occurrence. It includes all of the steps or connected incidents from the first cause to the final results. It is not limited in meaning to the initial cause but may include both cause and effect. [Guillod v. Kansas City Power & Light Co., 18 S. W. (2d) l. c. 100, and cases cited.] The event was sufficiently sudden and violent. It happened

without previous notice or with very brief notice. For an event to happen suddenly it is not required that all the incidents and circumstances of the event occur simultaneously. To constitute an accident within the definition of that word the event need not reach its consummation immediately. [Lovell v. Williams Bros., Inc., 50 S. W., (2d) 710, 713.] In the case last cited the event covered a period of several days and the occurrence was held to be within the meaning of the word accident and the injury compensable.''

In Industrial Commission v. Roth, cited in Wolf v. Mallinckrodt Chemical Works, supra, the complainant, on November 8, 1915, was directed by his employer to do some painting. Though not a painter he undertook to do the work. The weather was cold and the paint would not flow from the brush. He was directed to take the paint to a small building and heat it, which he did. The building was not properly ventilated. The paint, when heated, gave off poisonous fumes, which he inhaled. The process was required to be done from time to time throughout that day and the next. Roth became ill from the fumes and gases which he had inhaled and his illness continued to increase from day to day until it resulted in his death on November 26th. It was held to be an accident, and not an occupational disease.

In the case before us, as we have said, had plaintiff suffered injury by getting soot in his eyes in the manner described, only once, or several times within a short period, there could be no doubt that such injury would be compensable under the Compensation Act. The producing cause of the injury in this case did not all occur at one time or within a few days but, by what may be denominated a series of similar accidental occurrences, over a period of four or five weeks. Plaintiff first felt the smarting in his eyes when he had been at work three or four weeks. When he had been working about two months his eye became sore. Here we have an unexpected and unforeseen event, bearing in mind that the ''event'' referred to in the statute may be a result rather than a cause. Though plaintiff's act in wiping the sweat from his face and thus getting the soot in his eye, while thoughtlessly done, was his voluntary act in a sense, he did not intend, expect or foresee the injurious consequences thereof and the event was therefore unexpected and unforeseen within the meaning of the statute. [Fidelity & Casualty Co. v. Industrial Accident Commission, 177 Cal. 614, 171 Pac. 429.] There was sufficient violence to satisfy the statutory requirement that the event happen violently and there was violence to the physical structure of the body and disease or infection naturally resulting therefrom such as to constitute an injury within the meaning of the statute.

Did the event happen ''suddenly'' within the meaning of the statute? We think it did. It appears to us that the fundamentally accidental nature of the injury is not altered by the fact that the infec-

tion, if it may be so called, was gradual throughout a period of four or five weeks, or that, instead of a single accidental injury, there was a series of accidental injuries culminating in the same consequential result. [McNeely v. Carolina Asbestos Co., 206 N. C. 568, 174 S. E. 509; Victory Sparkler and Specialty Co. v. Francks, 147 Md. 368, 128 Atl. 635.] In the McNeely case the complainant contracted pulmonary asbestosis by breathing air impregnated with fine asbestos dust over a period of about five months, due to the defendant's negligence. It was held to be a compensable injury under the North Carolina compensation statute, which provided for compensation for "injury by accident arising out of and in the course of the employment." The court said, 174 S. E. 1. c. 512:

"Moreover, it would not seem that the unexpected, unforeseen, and, therefore, accidental inhalation of deleterious matter could be deprived of its accidental quality by the mere consideration of whether it took five days or five months to produce the same result."

The McNeely case is perhaps an extreme case, under statutes providing compensation for "injury by accident." We have been cited to no other case in which a similar injury, so sustained, was held to be compensable, except the Victory Sparkler Company case, supra, which is cited in the McNeely case. In the Victory Sparkler Company case, however, the court distinguishes between "accidental injury" as provided for by the Maryland statute, and "injury by accident," as provided for in many other jurisdictions.

We are not required in this case to go so far as did the North Carolina court in the McNeely case. It would be difficult to formulate a definition of injury by accident that would adequately cover all situations that might arise and we shall not attempt it. Suffice it to say that under plaintiff's evidence we think a finding would be justified that he suffered an injury compensable under the Workmen's Compensation Act. It was not an occupational disease. Defendant's demurrer to the evidence should have been sustained. [Rinehart v. F. M. Stamper Co., supra.] It results that the judgment of the circuit court must be and it is reversed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.