MARY E. McKAY, Administratrix of the Estate of LEE McKAY, Deceased, v. DELICO MEAT PRODUCTS COMPANY, a Corporation, Appellant.—No. 38469.—174 S. W. (2d) 149.

Division One, September 7, 1942.

Rehearing Denied, October 4, 1943.

*Stanley Garrity* and *John W. Oliver* for Delico Meat Products Company; *McCune, Caldwell, Downing & Noble* of counsel.

878

*Henry W. McFeely, J. B. McFarland* and *Walter A. Raymond* for respondent.

 DALTON, C.—Action for $30,000 damages for personal injuries sustained by Lee McKay, the [151] original plaintiff, on account of alleged negligence of defendant. The jury returned a verdict for plaintiff for $10,000, upon which judgment was entered, and defendant appealed.

The death of plaintiff Lee McKay, subsequent to the date of the appeal, has been suggested and Mary E. McKay, his widow, the duly appointed, qualified and acting administratrix of his estate, has been substituted as respondent. For convenience we shall refer to the original parties as plaintiff and defendant.

Plaintiff charged that during the month of March, 1940 and on the first and second days of September, .1940, while he was employed under contract to work in and about defendant's buildings in the making of certain repairs, the defendant carelessly and negligently caused and permitted dangerous and injurious quantities of smoke, poisonous gases and fumes to escape into and remain in the interior of the buildings where plaintiff was required to work; that plaintiff complained thereof to defendant; that said fumes and gases were

destructive of the tissues of the human body; that defendant negligently an untruthfully represented that said smoke, gases and fumes were harmless; that plaintiff had had no experience working in smoke, gases and fumes and, relying upon defendant's assurance that they were harmless, continued with his work breathing and inhaling the smoke, gases and fumes; and that as a direct result he received severe and lasting personal injuries, which he described. Defendant's answer is a general denial and a plea that plaintiff and defendant were subject to the conditions and provisions of the Workmen's Compensation Act of Missouri, Chapter 29, R. S. 1939; that the Workmen's Compensation Commission was vested with original jurisdiction to determine the rights of plaintiff against defendant and the obligations of defendant to plaintiff; and that the circuit court was without jurisdiction. The reply is a general denial of new matter.

Error is assigned on the court's action in refusing a peremptory instruction in the nature of a demurrer to the evidence offered by defendant at the close of all the evidence.

Keeping in mind the rule that on demurrer to the evidence the plaintiff's evidence must be taken as true and defendant's evidence be disregarded, unless it aids the plaintiff's case, and that plaintiff is entitled to the benefit of all favorable evidence and of all reasonable inferences to be drawn therefrom, we shall state that part of the evidence bearing upon the issue as to whether plaintiff was an employee of or independent contractor for the defendant.

Plaintiff was a bricklayer by occupation and had been contracting about thirty years. Defendant, a Missouri corporation, was engaged in the business of manufacturing sausages and meat products in Kansas City, including the smoking and curing of meats with hickory smoke. Its plant consisted of three separate brick buildings, but the floor levels were not the same, and defendant proposed to make them into one building and to build the floor levels to "more or less the same level" and to add an additional room. It became necessary to make arrangements with carpenters, cement men, stonemasons, bricklayers, steel men and others to do various parts of the work, and defendant's representative, Mr. Kahmann, negotiated with plaintiff to do some of the brick work.

On May 20, 1939, plaintiff made a written proposal to defendant to furnish the material and labor and do certain specified brick work for $1696.65. This proposal was accepted. Three days later plaintiff submitted to defendant a further written proposal as follows: "I propose to furnish brick trestles, mortar boxes, mortar boards necessary to do brick work on Delico Meat Products Company Building located 1121 Twelfth Street Kansas City, Missouri. You pay for all material and payrolls, all liability insurance for all men working with my (sic) and myself (sic) and pay me at the rate of $12.00, (twelve Dollars) per day for my labor on job, plus two percent, 2%, on all materials and labor on brick work. This proposal, if accepted,

voids proposal dated May 20, 1939. I guarantee if this proposal is accepted and the quality of work are (sic) the same specified in proposal dated May 20, 1939, that the total cost on the brick work will not exceed $1696.65, contract price.''

Plaintiff testified that defendant accepted this proposal: that it contained his agreement with defendant; that, thereafter, he ''remodeled the whole building, built several walls and built up several openings, put in a large quantity of floor, built the smoke houses and sausage house on top of the present boiler room and [152] garages, docks;'' and that he was paid according to this agreement. Plaintiff later said the original proposal was supplemented by the second proposal and that his work was based on the two proposals. The second proposal, however, did not list the particular brick work, nor did it refer to the brick work as being ''in accordance with plans,'' as did the first proposal, but the figures concerning total cost were the same.

Plaintiff further testified: ''Well, after they signed the original of the first contract they called me up and asked me to come down, they wanted to talk to me, and I went down there and (they) asked me how I would like to take the job on a cost plus, that they had figured there would be a great deal more work than we had incorporated in the contract so I told them the cost plus would be all right. So they figured out about what the job would be worth if I had them paying for all the material and paying for the Social Security and the insurance, it would cut the profit down to about two percent from the original—on the usual ten percent that subcontractors get over and above wages. . . . Q. And in figuring out this two percent in making this final agreement, did you take into consideration that they would pay the compensation and insurance and all those things? A. Yes. If it hadn't been that way the percent would have been a great deal greater. Q. And the Social Security? A. Yes.'' Plaintiff further testified concerning his conversation with defendant's representative, as follows: ''Due to the fact I had no card for a contractor, don't carry a card, . . . he couldn't work me in on the compensation because I wasn't a journeyman, and we debated quite a lot about it, and he said finally said, 'Well, I will probably have to take out a special insurance for you.' ''

On cross examination, plaintiff testified concerning the contract, as follows: ''Q. In any event, you did agree at that time that you would work for them (defendant) on a basis of twelve dollars a day plus two percent? A. Yes, that was the contract. Q. And the understanding was you would work on that basis just as long as there was any work for you to do? A. Yes. Q. And at any time during the period of time you were working for them, they might terminate the arrangement and you would be through, you understood that, is that right? A. Yes. . . . Q. Is there in that letter (second letter) any specification? A. Yes. Q. Where is it? A. It specifies in there that if the same amount of work is done it wouldn't exceed the con-

tract price we had in the first contract. . . . Q. The smoke houses weren't mentioned in that letter. A. Any amount of work they would do would be covered in that contract, whether it was smoke houses or what it was. The contract covered any amount of work, anything they would want to do. . . . The floors are not included in that contract. . . . But the contract was based on whatever they done, covered everything. They didn't know what they were going to do." Plaintiff further said the total amount to be paid to him was not limited by the written contract, after he "went on the cost plus basis," and that he got much more than the amount stated in the proposals.

Concerning the progress of the work plaintiff said: "Well, I went ahead and did the work that was set out in the first agreement we had signed there, and they made some changes, put in some changes that wasn't included in that and built some smoke houses that wasn't included in that first agreement and did quite a lot of patch work." Part of the brick work on the smoke houses (or smoke ovens) was done in March, 1940, and it was while doing this work and later, while working in the "coolers" in September, 1940, that plaintiff alleged he was injured. Neither the work in the "coolers" nor on the smoke houses was mentioned in either proposal.

Plaintiff testified that, when he went to work, he knew it was defendant's intention to keep its plant in operation while the repairs were being made, and that the plant was in operation "at all times." In this connection one of plaintiff's hod carriers testified for him, as follows: "Q. And the plant was in operation most of the time? A. Yes. Q. And you found it necessary to move from one job to another in order not to interfere with the plant operation, isn't that true? A. Yes. Q. And you were directed by Mr. Kahmann and Mr. Neuer when that would [153] be necessary, isn't that true? A. And Mr. McKay." Defendant's witness Kahmann testified to the same effect, "We would stop him (plaintiff) on one piece of work and send him on some other part of the building."

Concerning the detailed work on the smoke houses (or ovens), plaintiff testified that they were constructed on the west side of the building in the building; that they were remodeled and built up (the ceiling of the old smoke houses were only two feet from the ceiling of the building); that, when he finished, he used a tile ceiling hung on angle irons, which left openings in the tile; that after they "completed an oven" they "would have to get up there and concrete that top . . . seal all those pores so the smoke could not get out"; that what smoke escaped would be let out through new vents that were being installed; and that, while the work was in progress, smoke and gas and fumes leaked from ovens in operation and was "awful bad" where he (plaintiff) had to work. He further said: "I asked them (Mr. Neuer and Mr. Kahmann, defendant's representatives) if we couldn't increase the vents or install some fans or patch the old house roofs so we could stand to work up there, or if they would even shut

down the furnace on the smoke house next to us. . . . And they promised to do that on every house, but seemed as though they were crowded, their meat just had to be smoked, and we had to continue work, and they told me to go ahead, that there was no danger in there . . . I believed them and went ahead. . . . I tried to get them to open a hole in the roof or to put fans in or something to get rid of the condition, and it seemed as though every time we got up to it they couldn't very well close the plant. They never lost an hour's time on our part and there was no other way but just go ahead and stand it."

Concerning the time for which plaintiff was paid at the rate of $12.00 per day, he testified: "If I worked 10 hours, I would only charge them (defendant) up at 8 hour's work. In several instances where we couldn't get in to make measurements to see if a certain machine would block a door or something like that, why we would do that kind of work after working hours, after everybody had gone home. Q. Now, who would do that? A. Well, I and Mr. Kahmann and Neuer. Q. I see. All right, and did you receive anything for that time which you spent there? A. No. Q. All right. Did you ever get there early mornings and help work out any details? A. Yes, often we would go in there at seven o'clock. Q. And what time was the regular working period? A. Eight o'clock. . . . Q. How did you figure you were compensated for this overtime that you did? A. Well, that was part of the contract which was covered by the two percent, which is a compensation for your duties as a contractor. . . . Q. Now then, when you were off from time to time, . . . whatever time your work slackened, and you would be called back, did Mr. Kahmann or the Delico Meat Products Company call your men back, or did you have to go out and round them up and call them back? A. I would call them back. Q. I see. That took some little time, I presume? A. Yes. Q. And did you get any pay for the time you did that work? A. No. Q. How was that figured? A. That was figured in as a part of the contract." Plaintiff further said that he "took the twelve dollars a day as just a payment on the contract."

With reference to plans for the work, plaintiff testified: "There were some plans, but I never knew of any specifications. . . . The changes were made to fit the machinery that had to go in there, and the details of it was worked out in the office, and usually after working hours. They would call me in and we would go over it, take measurements and make the necessary changes. . . . When the details were changed, as we call them, those things were worked out in the office, and I was called in to see if it could be worked that way, and if it could be they would direct me to go ahead and do it. . . . I helped work out what we had to work on. They had certain machines that they wanted to install in certain spaces, and if there was anything

that interfered with it, we would have to make some other arrangement."

Concerning the important issue of the right to control, plaintiff testified: "Q. Now, as a matter of fact, Mr. Neuer and Mr. Kahmann did direct you [154] as to the work that was to be done, did they not? A. Yes. Q. Yes, Sir? A. They made the necessary changes. Q. Either or both of them would direct you, isn't that true? A. Yes. Q. Was that true through the entire job? A. Well, we followed the plans as far as we could go, but when we got into patch work they would tell me the windows they wanted closed out. . . . Q. Did they tell you what to do? A. Yes, they told me what to do. Q. Did they tell you how to do it? A. No. Q. I will ask you if this question was asked you (in a deposition taken December 12, 1941)? 'Did they tell you how to do it? A. Yes, sir.' Did you make that answer in your sworn deposition on page 21, of your sworn deposition while this case was going on? A. There is no doubt I made that answer. Q. Yes, and it was true yesterday, wasn't it? A. Yes. Q. And you made one or two changes in here and corrections and corrected your son's name. On your son's name, his first name is Everett? A. That is right. Q. And you corrected that in your own handwriting in your own deposition? A. Yes. . . . (Reading). 'Q. Mr. Neuer and Mr. Kahmann had complete control of the work, did they not, in directing you and other men how to perform the work. Isn't that true? A. Not other men. They directed me what changes there were in the plan.' Isn't that right? A. That is right. Q. (Reading) 'Question: Well, they directed you how to perform the work? Answer: Yes.' Isn't that true? A. That is true. Q. (Reading) 'Question: And directed you with regard to any details that might be changed or with regard to any method or manner in which the work might be done so as not to interfere with their business, isn't that true? A. That is right.' Is that right? A. That is right. Q. (Reading) 'Question: So that at all times you were under the direction and control of either Mr. Kahmann or Mr. Neuer? A. Yes.' A. That is right. Q. (Reading) 'Question: In connection with this work, isn't that true? Answer: Yes sir.' Is that right? A. That is right. Q. (Reading) 'Question: And, of course, you did follow their orders and their directions? Answer: Yes.' Is that right sir? A. That is right. Q. (Reading) 'Question: And they had the right to direct and control you? Answer: Yes, they had.' Isn't that true? A. Yes, that is true."

Plaintiff admitted that on December 13, 1939, while the work for defendant was in progress he testified (in a hearing before the Workmen's Compensation Commission on a claim for a leg injury incurred in 1938, at Richmond, Missouri), that his work with defendant "ran about thirteen dollars a day"; and that in answer to the question, "Were you employed by them or have you a contract with them," he had answered: "I was employed."

Plaintiff hired other individuals to assist him in his work, but defendant furnished the money used by plaintiff to pay these helpers. Plaintiff's crew consisted of four or more persons, himself, and one extra bricklayer or possibly two, and two hod carriers, who brought up brick and mortar. Plaintiff and Mr. Kahmann estimated the material that would be required and. Mr. Kahmann ordered it out.

In rebuttal at the close of the case, plaintiff testified that Mr. Kahmann did not direct the work of plaintiff's men; that Mr. Kahmann came around not more than once a day and sometimes not once in three or four days; that Mr. Kahmann did not talk to him on the job, about any particular kind of work; that Mr. Kahmann never told him "how the work could be done"; and that Mr. Kahmann was not a bricklayer. Plaintiff said: "How could he lay brick or tell me how to do it?" Plaintiff thereafter admitted he had previously testified as follows: "Q. Did either of these gentlemen, Mr. Neuer or Mr. Kahmann, direct you as to what work was to be done? A. Yes. Q. Either or both of them direct you? A. Yes. Q. Was that true throughout the entire job? A. Yes. Q. Did they tell you what to do? A. Yes. Q. Did they tell you how to do it? A. Yes. . . . Q. Is that right? A. That is right. [155] Q. And directed you with regard to any method or manner in which the work might be done so as not to interfere with their business, isn't that true? A. That is right. . . . Q. And they had the right to direct and control you? A. Yes, they had." In connection with the above testimony plaintiff further testified as follows: "Q. (By Mr. Garrity): Did you make those answers? A. Yes. Q. And those were true, weren't they? A. Yes. Q. And you signed those? A. Yes. Q. And you testified that way this morning? A. Yes."

During the period that plaintiff was working at defendant's plant, he was registered with the Missouri Workmen's Compensation Commission as a contractor. The Social Security (payroll tax) on the wages of plaintiff's helpers was paid through plaintiff and in his name. Plaintiff said that this was according to the contract with defendant, although Social Security was not mentioned in the written proposal. No Social Security tax was paid on plaintiff's wages, and, in the reports plaintiff made to the Social Security Commission, he designated himself as employer and his helpers as his employees. Of the funds paid to the Social Security Commission, plaintiff testified: "Q. It wasn't any of your money anyway, was it? A. Well, no, that was just an agreement that we had."

When paying the men who worked with him, plaintiff would figure up the amount of the payroll, take it to Mr. Kahmann, get the cash from him and then pay these men, none of whose individual names appeared on defendant's payroll. The second proposal, supra, provided that defendant carry liability insurance on plaintiff and his men and it is admitted that defendant carried compensation insurance and paid the premiums, but whether such compensation

insurance was upon plaintiff and his men, does not appear. There is, however, a statement by plaintiff that in determining the two percent, he took into consideration that defendant would pay *compensation* and *insurance.*

The work was in progress at defendant's plant from May, 1939 to September, 1940, the last work being done about September 2, 1940, but plaintiff and his men did not work continuously, they were off from time to time. On August 10, 1940, and before the work was finished, defendant gave plaintiff a letter of recommendation as an ''honest, conscientious and skilled workman.'' The letter recited that plaintiff had ''contracted all the brick work for remodeling our buildings, including the laying of the brick floors.''

Appellant contends that the undisputed facts show that ''plaintiff was an employee as a matter of law and that as such was within the exclusive jurisdiction of the Workmen's Compensation Commission.'' Respondent on the other hand contends that plaintiff ''was an independent contractor as a matter of law''; that the evidence did not bring the case within the jurisdiction of the Missouri Workmen's Compensation Commission; that in any event, if there was an issue for the jury on whether plaintiff was an independent contractor or employee, the jury's verdict put that issue at rest; and that ''the defendant abandoned it by not requesting a legal and proper instruction on that issue.''

Whether or not the Workmen's Compensation Act (Chapter 29, R. S. 1939) was applicable was an affirmative defense and the burden of proof to establish that defense rested on defendant. Kemper v. Gluck, 327 Mo. 733, 39 S. W. (2d) 330, 333; State ex rel. Ebert v. Trimble, 333 Mo. 711, 63 S. W. (2d) 83, 86; State ex rel. St. Louis Car Co. v. Hostetter, 345 Mo. 102, 131 S. W. (2d) 558, 559. But, if from a most favorable view of the whole evidence, including solemn admissions by plaintiff of record, the facts admitted are such as a matter of law to bring plaintiff's right of action against defendant, for the injuries complained of, within the provisions of the Workmen's Compensation Act, then and in that event plaintiff may not recover in this action at common law and the demurrer should have been sustained. Pfitzinger to the Use of Stotscky v. Shell Pipe Line Corp., 226 Mo. App. 861, 46 S. W. (2d) 955, 958. It is well settled that the Workmen's Compensation Act is wholly substitutional in character and that any rights which a plaintiff might have had at common law have been supplanted and superseded by the act, if applicable. De May v. Liberty Foundry Company, 327 Mo. 495, 37 S. W. (2d) 640, 645; Kemper v. Gluck, supra; State ex rel. National Lead Co. v. Smith (Mo. App.), 134 S. W. (2d) 1061, 1065. Respondent concedes that ''if this is a compensation case, it cannot also be a common law case.''

Defendant alleged that both plaintiff and defendant were under and subject to the Missouri Workmen's Compensation Act,

but there was no evidence that defendant was under the act or had accepted it, other than an admission by plaintiff's counsel that defendant paid compensation insurance premiums. Evidence offered by defendant for the purpose of showing that defendant paid compensation insurance premiums on plaintiff and the men that worked with him was excluded. Defendant (appellant) in its brief says that "plaintiff does not question that defendant is subject to the Workmen's Compensation Act as an employer," and apparently this is true since respondent does not deny the assertion and insists further that the judgment must be affirmed, "unless plaintiff is an employee as a matter of law."

Was plaintiff an employee of defendant? Section 3695(a), R. S. 1939, Mo. R. S. A. Sec. 3695(a), defines an employee as follows: "The word 'employee' as used in this chapter shall be construed to mean every person in the service of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election, . . ."

This court has adopted the definition of master, servant and independent contractor as made by the American Law Institute's Restatement of the Law of Agency, Sec. 2, as follows:

"A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S. W. (2d) 58, 61; State ex rel. Chapman v. Shain, 347 Mo. 308, 147 S. W. (2d) 457, 460; Bass v. Kansas City Journal Post Co., 347 Mo. 681, 148 S. W. (2d) 548, 552; Hartwig-Dischinger Realty Co. v. Unemployment Compensation Commission, 350 Mo. 690, 168 S. W. (2d) 78, 81.

Skidmore v. Haggard, 341 Mo. 837, 110 S. W. (2d) 726, 730, and Mattan v. Hoover Co., 350 Mo. 506, 166 S. W. (2d) 557, 564, give a more detailed analysis of the principal factors to be considered in determining the relationship between parties, and authorities are cited. Other factors which may be considered are the party's right to use his own assistants and to supervise their work (Sargent v. Clements, 337 Mo. 1127, 1133, 88 S. W. (2d) 174, 177; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 1012, 82 S. W. (2d) 909, 916) and the right of the party to substitute another for himself in the performance of the prescribed duties. Coul v. George B. Peck Dry Goods Co., 326 Mo. 870, 874, 32 S. W. (2d) 758, 759. "No one of these various factors is in itself controlling; but each, in accordance with the circumstances of

the given case, will be given weight. . . . The primary factor, however, remains the extent of control exercised by the employer over the methods to be adopted by the employee. The master controls not only the result to be accomplished by the servant's work, but the details of the manner in which such work is done. The employer of the independent contractor controls the result accomplished only.'' Bass v. Kansas City Journal Post Co., supra, (148 S. W. (2d) 548, 552). Each case must depend upon its own surroundings, facts and circumstances, and be subjected to established specific tests *in aid of the ultimate and decisive test, right of control.* Maltz v. Jackoway-Katz Cap Co., supra; Barnes v. Real Silk Hosiery Mills, supra; Mattan v. Hoover Co., supra; Tokash v. General Baking Co., 349 Mo. 767, 163 S. W. (2d) 554. The mere fact that the employer has control over the amount of work to be done or has reserved the power to make alterations in the plans is not controlling. Barnes v. Real Silk Hosiery Mills, supra. The right to designate plans and specifications to be followed is not inconsistent with an independent contractor relationship, if it only amounts to a designation of the kind of result desired and the contracting agent is otherwise left free to reach it by his own methods. 'Skidmore v. Haggard, supra. The court must give heed to the varying circumstances bearing upon the question of whether the person rendering the service represents the will of his employer only as to the result of the work, or as to the means [157] by which it is accomplished. Rutherford v. Tobin Quarries, 336 Mo. 1171, 82 S. W. (2d) 918, 921.

Where the facts are undisputed no doubt exists that the court may declare as a matter of law whether one is an independent contractor or merely a servant. Baker v. Scott County Milling Co., 323 Mo. 1089, 20 S. W. (2d) 494, 497; Hoelker v. American Press, 317 Mo. 64, 296 S. W. 1008, 1011. In this case it is conceded that plaintiff was either an independent contractor or an employee. Both parties rely primarily upon plaintiff's own testimony as supporting their respective positions. It is; therefore, important to note that, while we must consider the evidence in a light most favorable to plaintiff and give him the benefit of all reasonable inferences supporting his position, we must determine the issue presented from a consideration of his testimony considered as a whole and not from part isolated from the rest. Skidmore v. Haggard, supra. Whether plaintiff's work was controlled or subject to the right of control by defendant and whether defendant actually controlled or had the right to control the physical conduct of plaintiff in the performance of his work is, we think, fully and conclusively answered by plaintiff's own testimony when considered as a whole.

Appellant relies particularly upon the case of Miller v. St. Louis Realty & Securities Co. (Mo. App.), 103 S. W. (2d) 510; and Vaseleou v. St. Louis Realty & Securities Co., 344 Mo. 1121, 130 S. W. (2d) 538. Appellant insists that these cases ''are controlling of the case at

bar." A mere reference to the cases, shows that they involved appeals from judgments affirming awards of the Missouri Workmen's Compensation Commission and that one of the issues presented was whether the Commission's findings of fact were supported by any substantial competent evidence. While the employee involved in said cases worked under substantially the same arrangement as the plaintiff in this case and the testimony concerning control of his activities appears to be very similar to the testimony here, no question concerning him being an employee as a matter of law was presented or decided in either of said cases. The statement in the latter opinion that "there is but one conclusion to be drawn and that is that he was an employee" was mere obiter.

The contract under which plaintiff worked called for defendant to pay him at the rate of $12.00 per day for his "labor on job." The words of the contract, "for my labor on job," admit of no substitution by plaintiff and plaintiff could not collect the $12.00 per day, except by personally performing his duties under the contract. While the contract called for "brick work," the contract was changed to cover anything the defendant wanted to have done. Plaintiff admitted that he patched "the doors and cut in some doors," put in floors, built a ramp, put in steel casing, filled up windows and doors, built smoke houses, put steel trusses across the top of the smoke houses, hung the ceiling on angle irons, put in plate tile, topped the smoke houses with an inch of mortar, and did other types of work. Except for the work mentioned in the first proposal, there was no fixed amount or kind of work to be done, and no lump sum price to be paid. The payment was to be $12.00 per day plus 2%, and plaintiff was to work on that basis as long as there was work to do. The work might continue indefinitely or defendant might terminate it at any time. The type and kind of work to be done and the place where it was to be performed was to be determined by defendant, and it was so determined. Defendant had absolute and complete control of the premises where the work was to be done and the conditions under which the work was to be performed. There were no advance specifications for the work and the plans for the smoke houses and other details were worked out while the work was in progress. It is admitted that defendant did not know in advance what would be done, but the agreement was to cover anything that was done. Defendant could and did tell plaintiff, and the men working with him, when and where to work, what to do and when to do it. The work on the smoke houses (ovens) and in the "cooler" was not mentioned or called for in any contract providing for a result to be accomplished. Defendant ordered and paid for the materials, furnished the money to pay plaintiff's helpers or assistants, paid the liability insurance on plaintiff and his men, paid (through plaintiff and in his name) the Social Security tax on the wages of the men selected by plaintiff to assist him in his work. It clearly appears from plaintiff's own testimony

that the $12.00 per day was to be compensation for plaintiff's own labor during regular hours and the 2% on labor and materials was to compensate him for outside [158] activities before and after hours, for consultation with defendant's representatives, and for securing and calling back the men, who worked with him.

Respondent points out that plaintiff was a "bricklayer contractor" engaged because of his special skill in laying brick; that as a specialist his work was done without supervision; that the first proposal specified particular work for a lump sum price; that the second proposal guaranteed the same price; that plaintiff furnished his own tools "brick trestles, mortar boxes and mortar boards"; that he selected and employed his own assistants; that he had his own payroll and delivered the pay to the men listed thereon; that the names of these men were not listed on defendant's payroll; that plaintiff told these men when to come to work; that the Social Security (payroll tax) was paid through him and in his own name; that no Social Security tax was paid on plaintiff's wages; that no one told plaintiff how to mix his mortar, how to handle his trowel or how to set a brick; that plaintiff listed himself as an employer and the men under him as his employees in reporting to the Social Security Commission; that plaintiff was registered as a contractor with the Workmen's Compensation Commission; and that defendant admitted he "contracted all of the brick work." Respondent says these facts made plaintiff an independent contractor as a matter of law, or at least created an issue of fact for the jury. We think these facts insufficient to make an issue for a jury in view of plaintiff's detailed testimony showing conclusively that defendant had the power to and did direct the details of the work to be done by plaintiff and his assistants and that there was no contract calling for a fixed or determined result to be fulfilled. We are not so much concerned with the factors and aid for determining the ultimate and decisive test, right of control, when a determination of that ultimate and decisive test conclusively appears from plaintiff's own testimony. We think it conclusively appears from plaintiff's own testimony that the defendant had the right to direct the details of how the work was to be performed and the manner in which the work was to be performed. But respondent says the plaintiff's testimony on that issue was a "mere conclusion wrung from this very sick man on cross examination." No such objection was made at the trial. In addition, we think the detailed facts testified to by plaintiff conclusively show the said conclusion was correct and any contrary conclusion was erroneous. Respondent further insists that plaintiff's evidence was so contradictory and conflicting on the issue of control that it cannot be said he was an employee as a matter of law, citing Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W. (2d) 644, 647(6). We do not so view the evidence. Respondent insists that plaintiff was independent contractor because he selected, employed, paid, directed and controlled the crew of men that worked

with him. If plaintiff was an employee of defendant, that is, if defendant controlled or had the right to control the physical conduct of plaintiff in the performance of his service and the details of the manner in which the work was to be done, then and in that event the members of plaintiff's crew, the men selected by him and working with him, were also employees of the defendant. See, Hartwig-Dischinger Realty Co. v. Unemployment Compensation Commission, supra. Respondent further insists that the evidence shows no control over plaintiff not required to co-ordinate the *bricklaying* and prevent interference with other ''contractors and with the operation of defendant's factory or to carry into effect changes in the plans and specifications''; and that control for these purposes did not destroy the independent contractor relationship. O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. (2d) 1085, 1089; Kourik v. English, 340 Mo. 367, 100 S. W. (2d) 901, 904. The evidence does not support the contention. We hold that plaintiff's own testimony establishes as a matter of law that he was employed to perform service for defendant in its affairs and that defendant controlled and had the right to control the physical conduct of plaintiff in the performance of that service.

Respondent next contends that plaintiff, even if an employee of defendant, was not under the Workmen's Compensation Act because (1) there was no *accident*, (2) the employment was *casual* and (3) it was not *incidental* to the operation of the usual business of the employer. Sec. 3695, R. S. 1939, Mo. R. S. A., Sec. 3695.

Respondent says ''there was no accident and the Workmen's Compensation Act is inapplicable.'' Respondent insists ''there were no distinct unusual occurrence or occurrences which were not the result of the work plaintiff was doing. . . . There was no particular time when anything [159] unusual or unexpected occurred with respect to this smoke or its effect on plaintiff. . . . The general working conditions remained the same and plaintiff gradually succumbed rather than being suddenly overcome by some unusual condition arising more or less suddenly. . . . Plaintiff's condition was brought about by the usual condition of his place of work and was the cumulative result of contact with this smoke and fumes over the period of his employment.'' Respondent cites Joyce v. Luse-Stevenson Co., 346 Mo. 58, 139 S. W. (2d) 918, 920; Row v. Cape Girardeau Foundry Co. (Mo. App.), 141 S. W. (2d) 113, 118; Downey v. Kansas City Gas Co., 338 Mo. 803, 92 S. W. (2d) 580, 585; State ex rel. Hussmann-Ligonier Co. v. Hughes, 348 Mo. 319, 153 S. W. (2d) 40, 42; and other cases. Respondent further points out that defendant's counsel in his opening statement to the jury said: ''There wasn't any accident here at all. . . . It is a matter of breathing certain smoke and stuff of that kind, and he says that has caused him to have a bad physical condition. Our contention is this is not the place or the court in which to try that. We have set it up in our

answer, and it is one of the issues in this case.'' Respondent claims that it was defendant's trial theory that there was no accident within the meaning of the compensation act. Defendant, however, by answer had denied generally the allegations of the petition and was contending that plaintiff and defendant were under the compensation act. In any case, plaintiff proceeded at once to offer proof concerning the receipt of personal injuries at the time, place and under the circumstances charged in his petition. Even if the statement of defendant's counsel be considered an admission that there was no accident within the meaning of the Workmen's Compensation Act, the admission was not accepted or acted upon by plaintiff, who proceeded to prove that there was an accident and injuries within the meaning of the compensation act and that the act was applicable. If it was, plaintiff made no case at common law. Plaintiff did not have to accept the so-called admission and did not do so. Ruppel v. Clayes, 230 Mo. App. 699, 72 S. W. (2d) 833, 835.

Section 3695(b), R. S. 1939, Mo. R. S. A., Sec. 3695(b) provides: ''The word 'accident' as used in this chapter shall, . . . be construed to mean an unexpected or unforeseen event happening suddenly and violently, with or without human fault and producing at the time objective symptoms of an injury. The term 'injury' and 'personal injuries' shall mean only violence to the physical structure of the body and such disease or infection as naturally results therefrom.''

Plaintiff's evidence tended to show that due to leakage of gas, fumes and smoke from the old smoke houses, which were in bad condition, an abnormal and unusual condition was created in March, 1940; that, due to failure to light the gas under some of the hickory sawdust burners, gas fumes escaped into the smoke houses and through the walls into the place plaintiff was at work; that, about September 1, 1940, while plaintiff was working in the ''coolers,'' the ice machines were in operation and ammonia escaped from leaky pipes and valves, and was ''awful bad''; that plaintiff had to work in dense smoke, gas and fumes for only twelve days during the total period of his employment; that no fans or circulation of air was provided to remove the smoke and gas; that plaintiff got smoke in his eyes; that his eyes were affected; that they burned, watered and were so full of tears that he could hardly see; that his eyes appeared unusually red and inflamed; that he breathed the smoke and gases into his lungs and coughed; that the smoke and gas affected his throat so that he could hardly talk; that the smoke, gases and fumes irritated his throat and interfered with his breathing; that from that time on he had a cough and something like a cold; that the smoke at times was so dense that he could not stand it; that it got the best of him; that he had to come down repeatedly and go out into the air; and that he had been a well man before, but while working in the smoke on this job he observed something unusual about his physical condition, he

began to cough, felt sluggish, easily became exhausted, ran a temperature and just felt bad all the time. He also suffered pains in his chest, complained thereof and started losing weight. In addition, plaintiff's suit is based on the theory of physical violence to the structure of the body at a particular time and place. Taking plaintiff's evidence as true, as we must on demurrer to the evidence, we think it clearly appears that plaintiff suffered an accident within the meaning of Section 3695(b), supra, and that his injuries occurred as a result of an abnormal, unforeseen and unexpected event in his employment, arising [160] more or less suddenly, and producing objective symptoms of an injury. Tindall v. Marshall's U. S. Auto Supply Company, 348 Mo. 1189, 159 S. W. (2d) 302, 306; See, Downey v. Kansas City Gas Co., 338 Mo. 803, 92 S. W. (2d) 580, 587; Vogt v. Ford Motor Co. (Mo. App.), 138 S. W. (2d) 684, 687.

Respondent further contends that he was not subject to the act, because Section 3693 (Third Subdivision), R. S. 1939, Mo. R. S. A., Sec. 3693, excludes particular employments, as follows: "Employments which are but casual or not incidental to the operation of the usual business of the employer." Respondent says that plaintiff was doing the brick work on a remodeling job; that remodeling was not the usual business of defendant; that it was not a recurring situation; and that the employment was casual. Respondent has overlooked Section 3695(d), R. S. 1939, as follows: "An employee who is employed by the same employer for more than five and one-half consecutive work days shall for the purpose of this chapter be considered a regular and not a casual employee." Plaintiff was not a casual, but a regular employee. McFall v. Barton-Mansfield Co., 333 Mo. 110, 61 S. W. (2d) 911, 917.

Was the work of plaintiff as an employee "not incidental to the operation of the usual business of the employer?" The petition alleged that "plaintiff became the contractor of the defendant to undertake certain *repairs* in and about defendant's buildings." Plaintiff's main instruction required a finding that "plaintiff was employed by defendant as a bricklayer contractor to make certain *repairs* on its buildings." (Italics ours.) It was therefore immaterial that the evidence showed that work done by plaintiff was remodeling, as well as *repairs* and patch work. We hold that the detailed work being done by plaintiff at defendant's plant was clearly and as a matter of law incidental to the operation of the usual business of defendant. March v. Bernardin, 229 Mo. App. 246, 76 S. W. (2d) 706. Even cases cited by respondent recognize repairs as incidental to the operation of such a plant. Rucker v. Blanke Baer Extract & Preserving Co. (Mo. App.), 162 S. W. (2d) 345, 347 (an independent contractor case).

Since it conclusively appears from plaintiff's evidence and from a most favorable view of the whole evidence that plaintiff was an "employee" of defendant within the meaning of the Workmen's Com-

894

pensation Act, the plaintiff failed to make a submissible case for a jury and the court erred in refusing to direct a verdict for defendant. It is unnecessary to consider other errors assigned. The judgment is reversed. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.