**Lowell K. HANDLEY, an individual, d/b/a Mutual Readers League of the Ozarks, Appellant,**

v.

**STATE of Missouri, DIVISION OF EMPLOYMENT SECURITY, and S. N. Crowe, George W. Wise and Charles E. Cates, constituting the Industrial Commission of Missouri, Respondents.**

No. 24160.

Kansas City Court of Appeals.

Missouri.

Feb. 1, 1965.

248

William A. R. Dalton, Donald W. Jones Daniel, Clampett, Ellis, Rittershouse & Dalton, Springfield, for appellant.

Gordon P. Weir, Lloyd G. Poole, Jefferson City, for respondent.

CROSS, Presiding Judge.

This action was filed in the Circuit Court of Cole County by plaintiff-appellant Lowell K. Handley, an individual doing business as Mutual Readers League of the Ozarks, to obtain judicial review of an order of the Industrial Commission of Missouri denying Handley's application for review of a decision made by the Appeals Tribunal of the Division of Employment Security of Missouri to the effect that certain individuals who performed service for Handley as sales managers, telephone solicitors, home solicitors and closers were in his "employment" within the meaning of that term as it is defined in the Missouri Employment Security Law and that Handley was an "employer", subject to its provisions, and liable for tax payments thereby imposed. The decision of the Appeals Tribunal is deemed to be the decision of the Industrial Commission for the purpose of judicial review. Section 288.200, subd. 1 V.A.M.S. The circuit court entered judgment affirming that decision after finding that it was supported by competent and substantial evidence and this appeal followed.

Appellant Lowell K. Handley is sole owner of the Mutual Readers League of the Ozarks and as such is engaged in a business described as a "budget magazine agency" offering magazine subscriptions for sale on a monthly payment plan. Handley is franchised under a contract with a parent organization, Mutual Readers League, Inc., of Des Moines, Iowa, which permits him to operate on its behalf on a shared profit basis in a territory within an approximate 200

mile radius of Springfield, Missouri. He maintains his principal business office in Springfield, and employed one office worker there as a personal secretary. He obtains orders for magazine subscriptions by utilizing the services of various sales people.

Describing his method of operation Handley testified in substance as follows: He "buys" subscription orders from sales people who obtain the orders by telephone and door-to-door solicitation. These individuals, eighty per cent of whom are experienced in that type of selling, are classified as sales managers, telephone solicitors, home solicitors and closers.

Handley operates through the medium of sales managers whose services he engaged by written contracts, terminable by him without notice and by the sales manager (designated as contractor) upon 24 hour notice. The contracts grant to "contractor" the right to sell budget magazine subscriptions and provide that he should be paid a specified commission on each subscription order—amounting to either 9 or 13 per cent.

In the year 1961 Handley had a total of six sales managers but only three at any one time. They worked out of offices located in the cities of Springfield, Bolivar, Monett and Joplin, in Missouri; Harrison, in Arkansas; and Pittsburg, in Kansas. The expense of maintaining these offices was shared by Handley and the sales managers on a fifty-fifty basis. Sales managers (and solicitors and closers as well) are *not* furnished a drawing account, expense money, a car, postage or advertising material, including business cards and other items of solicitation. Some limited supplies consisting of purchase contract blanks, sales cards and stationery are furnished to Handley by the parent Mutual Readers League. These are "passed along" by him for use by the sales people. The sales managers are responsible directly to Handley, and their basic responsibility is to hire solicitors and closers and to complete the sales.

As to the means by which sales managers were permitted to obtain their sales, Handley stated, "They can either do it—well, they can do it however they want. Some of them do it through the telephone soliciting program or through door-to-door sales program, and it is up to them to hire and train who they want". Sales managers hired, fired and instructed solicitors and closers. Commissions earned by solicitors and closers were paid to them by Handley but were charged against and deducted from the commissions paid by him to sales managers, with the result that the total expense to Handley of a particular sale was the 9 or 13 per cent paid to the sales manager.

The sales managers were not assigned to or limited as to any particular territory in which they might operate and Handley exercised no control over them in that respect. Their only limitation would be that of their own telephone service area. Handley made no attempt to tell sales managers who their employees would be. He did not require managers, solicitors or closers to work any specific hours or to make any set number of calls or produce any set number of contracts. No reports were required of sales managers.

Solicitors could operate either at home or in the office facility furnished by sales managers or by Handley. Instructions given to beginning telephone solicitors consisted of a printed sales talk to read over telephone. Office space and a telephone were available to them but they were free to work at home or elsewhere. They were not assigned any particular territory. Telephone solicitors secured the names of prospects from the telephone book and called them by telephone. When such a person indicates he is interested in buying a subscription, a "closer" is sent out to contact the prospect and complete the sale. Sales managers set the amount of commission per order paid to their solicitors and closers. Telephone solicitors who work at home are usually paid two or three dollars commission on each completed order. Telephone solicitors who work in Handley's office and use his telephone are ordinarily paid $1.15 per hour. Closers did not work out of the office but

acquired their "leads" by contacting sales managers or solicitors. These leads do not pass through any kind of bookkeeping system in Handley's office and he keeps no record of them. He has no record of how many leads were closed by the closers and had no way of knowing what they were doing on the job. The only sales record kept by him is on the sales after they are completed—a collection record. Handley was concerned only when a contract was produced and turned over to him by the sales manager.

The sales people are not under bond, do no collecting and are not required to keep any record of their activities. Handley holds no meetings for them to promote sales. All sales personnel, including sales managers, solicitors and closers are free to take employment on the side and some of them do.

Handley asserts that he does not attempt to exercise any control over sales managers, solicitors or closers as to how to go about their work. That is up to them. He is interested only in the product of their work— in their results. He sets no quotas for them to produce. They make no report of what they do in the field. "That is entirely their own business". Handley stated in reference to the contracts made with sales managers that it was his intention, by executing them, to make those persons independent contractors. The same type of contracts are entered into with closers in some instances. No withholding for federal income tax or social security tax is deducted by Handley from any commissions paid and no question has been raised as to his liability for federal unemployment tax. He carries no workmen's compensation insurance on any sales person.

Testifying on behalf of the Division, one of its field auditors, William A. Ward, identified its Exhibit No. 1 as a record covering the interval from January 1, 1961 to May 13, 1961, showing disbursements of commissions and wages paid by Handley to some 109 individuals during that time. The exhibit does not show the nature or extent of service for which the payments were made. Mr. Ward testified there was no daily or weekly work record of those individuals in Handley's office. The exhibit does not indicate whether the individuals listed thereon as engaged in sales work were sales managers, solicitors or closers. Mr. Handley was able to identify only three of the listed individuals as sales managers. He stated that he was not familiar with the names and could not tell which ones worked in Missouri and which ones worked in Kansas or other states; and, that the record introduced by the Division does not show the number of sales people he had in Missouri during a specific period of time.

Leonard Peterson testified that he did some work for the Mutual Readers League in the summer of 1961. He was engaged by a "salesman" at Springfield—not by Handley. He was given a written "sales talk" and assigned to work as a house-to-house solicitor under a "crew chief" at a salary of $30.00 per week which was later reduced to $20.00 per week. After so working for about a month he was transferred to telephone solicitation work in the Springfield office for which he was paid $1.50 per order.

Gary Pretti testified that he worked for the Mutual Readers League of the Ozarks in 1961—"off and on" for approximately eight months. He first worked in Springfield, where he "closed orders" and sold on the telephone. He was hired by a sales manager named Bob Crosby, who gave him a "set sales pitch". Any orders he closed he sent to the sales manager. He was paid "strictly commission" on both telephone solicitation work and for closing. He later became sales manager of the Joplin, Missouri, office, where he had under his supervision three or four female workers who worked as telephone solicitors and were paid "strictly commission". The only records he sent to the Springfield office were the contracts he had closed and a daily record of closed orders. He was not required to keep records showing the number of tele-

phone contracts or persons solicited. As sales manager he signed a "working agreement" with Handley, to the effect that he was working for himself as an independent contractor and would sell Handley the orders. He stated that when he signed the agreement he understood and intended that he was to be independent and working on his own.

▆ It is the function of this court in the present review to determine whether the findings and decision of the Commission are authorized by law and are supported by competent and substantial evidence on the whole record, whether that tribunal could have reasonably made its findings and reached its result upon consideration of all the evidence before it, and whether the circuit court on review properly ruled the issue. Christian Board of Publication v. Division of Employment Security, Mo.App., 279 S.W.2d 55, V.A.M.S., Constitution, Art. 5, Sec. 22. "We should give due deference to the findings of the Commission, when based on controverted parol evidence; but if we find, on the *whole* record, that the decision is clearly contrary to the overwhelming weight of the evidence we should reverse the judgment affirming the decision * * *." National School of Aeronautics, Inc. v. Division of Employment Security, Mo.App., 226 S.W.2d 93, and cases cited.

In a single point Handley urges that the judgment is erroneous and should be reversed. He essentially contends that the decision under review is contrary to the evidence on the whole record and constitutes error because the Commission could not have reasonably made the finding that the various sales individuals were in "employment" as it is defined by the Unemployment Security Law. Handley insists that upon consideration of the whole record the Commission should have ruled that those persons were independent contractors.

Respondents meet and accept this issue by suggesting that this case should be decided under pertinent provisions of the Unemployment Security Law *as interpreted* *by the Supreme Court in cases which hold that "the usual tests for determining the existence of the status of an independent contractor should be considered".* (Emphasis supplied.) In their brief respondents concede that "If it were held that (sic) under the evidence in this case that the relationship of independent contractor applied as between the appellant and the sales managers, telephone solicitors, home solicitors and closers, then the service performed by these groups of individuals would not be considered as 'employment' subject to the law". However, it is respondents' position that there is evidentiary support of the Commission's decision to the contrary.

Thus the determinative issue presented is whether there is substantial and competent evidence on the whole record to establish that the named classes of individuals are in "employment" or whether, to the contrary, they are independent contractors. Pertinent to this inquiry are the following quoted provisions of the Unemployment Security Law:

"Section 288.032. 'Employer' means:

"(1) Any employing unit which for some portion of a day, in each of twenty different calendar weeks, within either the current or the preceding calendar year, had in employment, but not necessarily simultaneously, four or more individuals (and for the purposes of this definition, if any week includes both December 31 and January 1, the days up to January 1 shall be deemed one calendar week and the days beginning January 1 another such week). * * *

"Section 288.034. 'Employment' means:

"(1) Service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied. * * *

\*   \*   \*   \*   \*   \*

"(5) Service performed by an individual for wages shall be deemed to be employment subject to this law unless it is shown to the satisfaction of the division that

"(a) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

"(b) Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(c) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

\*   \*   \*   \*   \*   \*

"Section 288.036. 'Wages' means all remuneration payable or paid, for personal services including commissions and bonuses and the cash value of all remuneration paid in any medium other than cash. \* \* \*"

Section 288.030, Subsection 14, (under the definition of "Employing Unit") provides in part as follows:

"\* \* \* Each individual engaged to perform or to assist in performing the work of any person in the service of an employing unit shall be deemed to be engaged by such employing unit for all the purposes of this law, whether such individual was engaged or paid directly by such employing unit or by such person, provided the employing unit had actual or constructive knowledge of the work".

■ The pioneer decision on the question here presented was rendered by the Supreme Court in the case, A. J. Meyer &

Co. v. Unemployment Compensation Commission et al., 348 Mo. 147, 152 S.W.2d 184, where, in a comprehensive opinion, the court placed its interpretation on various provisions of the then recently enacted unemployment compensation statutes. In particular, it was held by the court that the tests presently set out in Section 288.034 V.A.M.S., Subdivision (5) (a), (b), (c) are usual tests for determining whether or not the relation of independent contractor exists and that the purpose of placing those provisions in the act was to make plain the basis upon which those in the independent contractor relationship were to be excluded. Holding as a matter of law that the individuals concerned in the case were independent contractors, the Supreme Court declared that those persons were not in employment within the meaning of the act. The clear effect of the Meyer opinion, resulting from its direct holdings and expressed approval of quoted authority, was to declare that the statutory definition of employment is no broader than the common law concept of the master and servant relation, and that in drafting the unemployment compensation statutes the legislators intended that the common law tests of employment relationship should likewise be the test of whether an individual is in employment as defined by the statute or has the status of an independent contractor. Since the Meyer decision, Missouri courts have consistently applied this test in their determination of the question. See Hartwig-Dischinger Realty Co. v. Unemployment Compensation Commission, 350 Mo. 690, 168 S.W.2d 78; Trianon Hotel Co. v. Keitel et al., 350 Mo. 1041, 169 S.W.2d 891; Atkisson v. Murphy, 352 Mo. 644, 179 S. W.2d 27; National School of Aeronautics, Inc. v. Division of Employment Security, Mo.App., 226 S.W.2d 93.

■ The established criteria for determining whether an individual is an employee or an independent contractor are found in many Missouri decisions. In Atkisson v. Murphy, supra, the Supreme Court approved the following quoted con-

cept of an independent contractor: " 'According to the definition substantially adopted by many courts, with some variation in language, an "independent contractor" is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer except as to the result of his work.' * * * 'The right of control as to the mode of doing the work is generally held to be the principal consideration in determining the relationship, but "retention of the right to supervise as to results, as distinguished from the right to supervise as to the means by which the intermediate results should be obtained, does not affect the relationship." ' "

The Supreme Court has adopted the definitions of master, servant and independent contractor as formulated by the American Law Institute's Restatement of the Law of Agency, Chapter 1, Sec. 2, and his frequently applied them in cases involving the issue now before us. See McKay v. Delico Meat Products Co., 351 Mo. 876, 174 S.W.2d 149, and cases cited. Those definitions are as follows:

"A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

"A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

"An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking".

■ Missouri courts recognize and apply certain specific tests in determining whether an individual is an employee or an independent contractor. The various factors to be considered have been summarized in Lawrence v. William Gebhardt, Jr. & Son, Mo.App., 311 S.W.2d 97, as follows:

"the extent of control which, by the agreement, the alleged employer may exercise over the details of the work; the actual exercise of control; whether the person performing the service is engaged in a distinct and independent calling, requiring the skill of one specially trained; whether the work is usually done under the direction of an employer, or by a specialist without supervision; the length of time for which the person is hired; the right to discharge the worker at any time prior to the completion of the work; the method of payment, whether by the time or by the job, without reference to the time consumed in performing the service; whether the alleged employer or the workman supplies the necessary tools, machinery and appliances; whether or not the work is a part of the regular business of the alleged employer; whether the employer has the right to hire, discharge and determine the pay of others who assist the worker in the performance of the work; and whether the alleged employer directs the details of the work performed by those assisting said worker".

In Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S.W.2d 909, the Supreme Court stated that "each case must depend upon its own surroundings, facts, and circumstances, and be subjected to established specific tests in aid of *the ultimate and decisive test, right of control.*" (Emphasis supplied.) In other decisions the courts have characterized the right of control as "of the greatest significance"; [1] "of su-

1. Coy v. Sears, Roebuck & Co., 363 Mo. 810, 253 S.W.2d 816.

preme importance"[2]; "the primary test"[3]; "determinative"[4]; and "the controlling consideration"[5].

■ With exception as to telephone solicitors who worked in Handley's office and were paid by the hour—a group of individuals we reserve for special discussion later in this opinion—the evidence which we have previously reviewed in detail reveals that Handley made no attempt to exercise any control whatever over the sales managers, solicitors or closers as to the details of or how to go about their work, that he was interested only in their ultimate product—"their results", and that neither Handley nor those individuals intended that their operations would be subject to his control. No production quotas were imposed upon them. They were not controlled or restricted as to geographic operating area. They were not required to work specific hours or make any set number of calls or contacts. No activity or production reports were required of them. Handley furnished them no supplies except contract forms and sales cards, no postage, no advertising, business cards or other items of solicitation, no expense money or drawing account and no transportation. They were free to accept other work and some of them did so. They were not under bond, no deduction for social security, federal unemployment or income tax was withheld from their commissions and no workmen's compensation insurance was carried on their behalf. All the foregoing enumerated factors persuasively indicate the independent contractor status. As we said in National School of Aeronautics v. Division of Employment Security, supra, wherein we held, contrary to the decision of the Commission, to the effect that certain salesmen were shown to be independent contractors by the overwhelming weight of the evidence, "The facts in the Meyer case are so similar to those involved in this case that they cannot be distinguished".

Again, in this case, we repeat that the facts are not distinguishable from those in the Meyer case from which the Supreme Court determined as a matter of law that the salesmen there involved were independent contractors. Consequently we are impelled to hold that there is no substantial and competent evidence to support the Commission's decision that the sales managers, telephone solicitors, home solicitors and closers under present discussion were in "employment" under the act, and that such decision is contrary to the overwhelming weight of the evidence.

■ Our ruling is otherwise as to the special group of telephone solicitors which we specifically excluded from the foregoing discussion and holding. The evidence shows that there were some individuals who worked for Handley in his Springfield office as telephone solicitors and were paid at the rate of $1.15 an hour for their work. Those persons worked a regular shift, kept a record of their time, and turned it in to appellant as a basis for payment of their wages. Unlike the other solicitors, the closers and sales managers, they were not paid "by the job", but by the hour. "Payment by a unit of time, such as an hour, day or week, is very strong evidence of employment status". Larson, Workmen's Compensation Law, Vol. 1, Sec. 44.33(a), quoted with approval in Pratt v. Reed & Brown Hauling Co., Mo.App., 361 S.W.2d 57. The very nature of such service raises the implication that the person for whom it is performed has the right to control the details of its performance. Hence, the decision of the Commission that the telephone solicitors who worked on an hourly basis and were paid accordingly is consistent with the whole evidentiary record.

2. Garcia v. Vix Ice Cream Co., Mo.App., 147 S.W.2d 141.

3. Hackler v. Swisher Mower & Machine Co., Mo.App., 284 S.W.2d 55.

4. Bernat v. Star-Chronicle Pub. Co., Mo. App., 84 S.W.2d 429.

5. Ellegood v. Brashear Freight Lines, 236 Mo.App. 971, 162 S.W.2d 628.

Notwithstanding we have found that under the decision of the Commission it has been established by requisite evidence that *some* telephone solicitors were in the "employment" of Handley during the time in question, we cannot affirm the judgment before us. There is no showing that any particular number of that class of individuals rendered service at any particular time in any particular state during the pertinent interval. Therefore, it has not been established that Handley is an "employer" as defined by Section 288.032 because it has not been established that he had four or more individuals in "employment" in each of twenty different calendar weeks within the calendar year of 1961. However, we shall not foreclose the respondents from an opportunity to consider additional evidence.

In accordance with all the foregoing, we reverse the judgment with directions that the circuit court remand the cause for further proceedings consistent with this opinion.

All concur.

BROADDUS, J., not participating.